*Charles Cottam,* for Donnelly Bros., Inc. and Thomas C. P. Donnelly (petitioners in certiorari).

209 A.2d 232.

INDUSTRIAL NATIONAL BANK OF PROVIDENCE, *Trustee, et al.* *vs.* BOSTON STORE REAL ESTATE COMPANY.

APRIL 8, 1965.

PRESENT: Condon, C. J., Roberts, Paolino and Powers, JJ.

Powers, J. This is an action of assumpsit to recover $1,009.98 plus interest which the plaintiffs allege is their proportionate share of rents collected by the defendant on property in which the parties have varying fractional interests. It was tried to a superior court justice sitting without a jury and resulted in a decision for the defendant. The case is before us on the plaintiffs' bill of exceptions to the decision and to certain evidentiary rulings.

The basic facts are not in dispute. The parties and Susan P. Plummer, who is not involved in these proceedings, are the equitable and/or legal owners of separate but contiguous lots of land situated on assessors' plat 20 and which constitute a single parcel. It is bounded southerly by Westminster street, easterly by Eddy street, northerly by Fulton street and westerly by Union street in the city of Providence.

This parcel is covered by a large building which for many years prior to February 18, 1957 was occupied by Callender, McAuslan & Troup Company, hereinafter called "Callender." It operated a retail establishment commonly known as the "Boston Store."

It further appears that defendant is the owner of lots numbered 29, 24 and 138. The plaintiffs are the owners of lot numbered 116. Although not involved in these proceedings Susan P. Plummer is the owner of lots 117 and 23. The parties also own corresponding fractional interests in the building in question.

It further appears that lot 29 although not actually con-

stituting half of the parcel in question is covered by what the parties refer to as the westerly half of the building which is owned exclusively by defendant.

On February 18, 1957, Callender surrendered the westerly half of the building to defendant. Thereupon defendant leased it to Blackstone Holding Corporation for a term of 25 years. It took possession of the six floors of the westerly half conducting a retail establishment known as "Peerless" and will hereafter be referred to as "Blackstone" and/or "Peerless."

Callender continued to operate its retail establishment in the easterly half of the building under separate leases with defendant, plaintiffs and said Susan P. Plummer. Subsequent to the 1957 lease between defendant and Blackstone and/or Peerless the latter entered into an arrangement with Callender. By the terms thereof Blackstone and/or Peerless occupied the easterly half of the second floor in return for which Callender was permitted to occupy the westerly half of the fourth and fifth floors. Under this arrangement, however, Blackstone and/or Peerless were to vacate the easterly half of the second floor if and when Callender ceased operations.

On March 31, 1958, Callender went out of business. Anticipating that occupancy of the easterly half of the second floor would be terminated Blackstone and/or Peerless commenced proceedings in equity against defendant and Callender. This cause is Equity No. 26717 in the superior court and the papers therein became a part of the instant proceedings. They disclose that defendant and Callender were enjoined from interfering with complainants' occupancy of the easterly half of the second floor. The following month, April 1958, Callender was petitioned into receivership and that cause in the superior court is entitled C. Richard Blake v. Callender, McAuslan & Troup Company, Equity No. 26736. A permanent receiver was appointed and permitted to intervene in Equity No. 26717.

The first floor of the building was divided in half by a wall which, however, had openings permitting uninterrupted traffic between the easterly and westerly halves. The restraining order entered in Equity No. 26717 also restrained defendant, respondent therein, from sealing off those openings. This fact is significant because at the time the order was entered, and prior thereto, defendant had been negotiating with F. W. Woolworth Company, hereinafter called "Woolworth," for a lease of the first floor and basement of the easterly half of the building. It seems clear from the evidence that Woolworth was not interested in leasing the premises unless they constituted a self-contained unit. Obviously, this condition could not be met so long as defendant was in no position to seal off the openings heretofore described.

Although Callender went out of business on March 31, 1958 and pursuant to its arrangement with Blackstone and/or Peerless the latter was to vacate the easterly half of the second floor in such a contingency, Blackstone and/or Peerless continued its occupancy under the restraining order entered in Equity No. 26717. It did so, however, without paying rent to anyone.

This situation was untenable and the evidence discloses that several conferences were held to bring about a satisfactory termination. On July 10, 1958 a consent decree was entered in Equity No. 26717 which provided that Blackstone and/or Peerless would continue to occupy the easterly half of the second floor, rent free, through February 28, 1959. Thereafter it would pay $1,250 monthly to defendant from March 1, 1959 through June 30, 1959, on which date it would quit the easterly half of the second floor. Furthermore, defendant was not at liberty to seal off the first floor openings until after June 30. The instant plaintiffs, referred to throughout the trial as owners of the Fulton land, entered their consent to this decree as did the receiver with the consent of the court.

Two days prior to the entry of said decree, namely, July 8. 1958, a memorandum drafted by defendant was signed by C. R. Blake, treasurer of defendant corporation as its agent, and the following day the memorandum was signed on behalf of plaintiffs by Kenneth S. Fletcher as their agent.

On July 10, 1958, the date of the consent decree in the Blackstone and/or Peerless suit against defendant and Callender, a decree was entered in the receivership proceedings whereby the receiver was authorized by the court to disaffirm the lease existing between Callender as lessee and the instant plaintiffs as lessors. This was in accordance with the memorandum of July 8, 1958 and paved the way for plaintiffs to lease their interest in lot 116 and the portion of the building covering said lot to defendant so that the latter corporation might in turn execute a lease with Woolworth which the evidence discloses preferred to negotiate with a single landlord.

It is also to be observed that although Blackstone and/or Peerless was to have vacated the easterly half of the second floor on June 30, 1959, it continued in occupancy paying the monthly rent of $1,250. It was still in possession on September 21, 1959 when plaintiffs leased their interest to defendant in accordance with paragraph numbered 4 of the July 8 memorandum.

The plaintiffs predicate the action at bar on the unnumbered introductory paragraph of said memorandum and the damages they seek represent 12 per cent of the rent collected by defendant from Blackstone and/or Peerless for rental of the easterly half of the second floor from March 1, 1959 to the execution of the lease between plaintiffs and defendant on September 21, 1959 as aforesaid.

The exact agreement reached by the parties and set forth in the July 8 memorandum is as follows:

"The owners of the Fulton land will consent to the terms and provisions of the settlement of the Peerless suit (i.e., so far as the owners of the Fulton land are

concerned this means that Peerless will be allowed to continue in possession of the 2nd floor rent free until February 28, 1959, and thereafter at a total rental for the easterly half of said building of $1,250., of which Fulton will be entitled to 12%, but in any event Peerless will get out of the entire 2nd floor in the easterly half of the building not later than June 30, 1959) on the following conditions:

"1. Boston Store Real Estate Company will pay to the owners of the Fulton land as ground rent from the rent paid by Woolworth the sum of $3,500. annually plus 12% of the amount by which Woolworth's rent exceeds $60.000. a year, but in no event more than $500. under this percentage, plus 12% of the gross amount received from the rental of the 2nd and 3rd floors of the easterly half of the building, but in no event more than $1,000. In other words, the owners of the Fulton land will receive under this arrangement not more than $5,000. rental annually, and not less than $3500 annually from the Woolworth rent.

"2. In addition, Boston Store Real Estate will pay the taxes assessed on the Fulton land and the building situated on the Fulton land.

"3. It is also understood that the owners of the Fulton land will cooperate with Boston Store Real Estate Company in an attempt to get their taxes reduced. This includes and envisages the possible necessity of a court action, at no expense to the owners of the Fulton land.

"4. "It is understood that the old lease between Callender, McAuslan & Troup Company and Fulton Land Company will be disaffirmed and a new lease will be entered into between the owners of the Fulton land and Boston Store Real Estate Company for the same term as is provided for in the Woolworth deal, i.e., a 20 year lease plus a 10 year option to renew of the tenant, and that under this lease the obligation of Boston Store Real Estate will be as here-

inbefore set forth plus the obligation to pay taxes on the Fulton land, and it is also understood that simultaneously with the foregoing title to the building on the Fulton land will be transferred to Boston Store Real Estate Company, and that in the lease with the owners of the Fulton land they will not have any right to purchase the building or any obligation to buy it back.

"5. It is understood that the receiver will do everything he can to urge the court to allow him to pay Fulton at the old rate plus taxes for the next four months, and that Fulton will accept the disaffirmance of its lease and make no claim for damages in the receivership proceedings other than rent and taxes for those four months.

"6. It is understood that the Woolworth lease will have to be pledged to an insurance company for the loan that will be necessitated under the terms of the Woolworth lease in order to make the capital improvements required thereunder, and that this pledge of the Woolworth lease will have priority over the obligations as hereinbefore set forth of the Boston Store Real Estate Company to the owners of the Fulton land.

"7. All of the foregoing representations and undertakings on behalf of Boston Store Real Estate Company are conditioned upon their obtaining the Woolworth lease, and hence its obligations to the owners of the Fulton land will only begin when Woolworth rent begins."

The plaintiffs contend that the unnumbered introductory paragraph was a separate contract, the consideration for which is contained in that portion of the memorandum numbered 1 through 7, or, in the alternative, that the memorandum in its entirety is ambiguous and should be construed against defendant by whom it was drafted.

It will be helpful at this point to note that in connection with the discussions which led to the execution of the

memorandum on which plaintiffs rely, it was agreed that the parties would each appoint an agent to represent their respective interests. The plaintiffs appointed Kenneth S. Fletcher, a trust officer of the Industrial National Bank, and C. R. Blake, treasurer of the Boston Store Real Estate Company, was appointed as agent for defendant.

Mr. Fletcher testified that the memorandum of July 8, 1958 was the result of a conference between the parties held on the previous day and that Mr. Blake was present and participating.

Mr. Blake, however, testified that he was not present at any such conference and further that the July 8 memorandum did not precede the entry of the July 10, 1958 decree, but rather that the memorandum was a result of the decree. He insisted that he had no previous knowledge of the terms of the decree and was under the impression that the provisions contained therein were ordered by the court.

He further insisted that paragraph numbered 7 of the July 8 memorandum was added by his counsel at his request so that there would be no obligation on defendant vis-a-vis plaintiff until Woolworth began to pay rent.

In reaching his decision the trial justice considered the July 8 memorandum to be a single agreement and held that paragraph numbered 7 thereof relieved defendant of any obligation to plaintiffs until Woolworth began payments of rent on March 19, 1960 in accordance with its lease. Hence he concluded defendant was not obligated to pay plaintiffs 12 per cent of the rent collected by defendant from Blackstone and/or Peerless during the period for which plaintiffs sued.

The trial justice acknowledged in his decision that ambiguous language is to be construed strictly against the person drafting it, but found nothing ambiguous in the memorandum on which plaintiffs relied.

From a reading of the trial justice's decision it is manifest that he was influenced by the testimony of defendant's agent Mr. Blake. This circumstance in our judgment led the trial justice to misconceive the clear import of the documentary evidence. While Mr. Blake testified that he did not recall any conference that led to the executing of the July 8 memorandum as an essential agreement to the settlement of the Blackstone and/or Peerless suit, the prevailing circumstances demonstrate that he was either confused or his memory was faulty. As previously noted Callender was a tenant of plaintiffs, defendant, and Susan P. Plummer under separate leases. Its arrangement with Blackstone and/or Peerless for the use of the easterly half of the second floor was a matter in which the three lessors were concerned. Thus the restraining order Blackstone and/or Peerless obtained against defendant and Callender did not bind plaintiffs. In this regard, therefore, the settlement of the Blackstone and/or Peerless suit by the decree entered July 10, 1958, permitting them to remain in possession of the easterly half of the second floor rent free until the following February 28 and for an additional four months at $1,250 monthly, would not have been binding on plaintiffs unless they consented. The evidence discloses that plaintiffs formally assented to the entry of the decree.

Moreover, by the terms of the memorandum and consent decree, the openings between the easterly and westerly halves of the building on the first floor were to be maintained through June 30, 1959, and by the terms of the decree defendant was enjoined from interfering with the sealing off of such openings until after June 30, 1959. The significance of this lies in the fact that Woolworth desired a self-contained unit on the first floor, hence there could be no occupancy by it until sometime after July 1, 1959. Indeed the premises were not ready for delivery to Woolworth until December 19, 1959.

Clearly, then, within the contemplation of the parties as

evidenced by the July 8 memorandum and the decree of July 10, 1958, Woolworth would not be paying rent until well after Blackstone and/or Peerless would have ceased to occupy the easterly half of the second floor and there would have been no rental period during which plaintiffs would have been entitled to their proportionate share. If such were the case, the agreement contained in the unnumbered introductory paragraph of the July 8, 1958 memorandum would be a nullity and such a result is untenable. Indeed the clear language of the memorandum refers to future obligations assumed by plaintiffs, and the testimony of the witness Blake to the contrary was without probative value.

In our judgment, therefore, the unnumbered introductory paragraph of the memorandum was the consideration for plaintiffs' consent to the terms of the decree terminating the Blackstone and/or Peerless suit and their obligation under a lease to be negotiated between defendant and Woolworth. The final paragraph, numbered 7, related to plaintiffs' interest in the lease to be negotiated between defendant and Woolworth and did not affect plaintiffs' rights under the introductory paragraph. We hold therefore that the trial justice erred.

In the view we take of the plaintiffs' exception to the decision, their exceptions to evidentiary rulings need not be discussed.

The plaintiffs' exception to the trial justice's decision is sustained, and on April 19, 1965 the defendant may appear in this court to show cause, if any it has, why the case should not be remitted to the superior court with direction to enter judgment for the plaintiffs in the sum of $1,009.98 plus interest.

*Ambrose W. Carroll*, for plaintiffs.

*Quinn & Quinn, Thomas H. Quinn, Frank Anzivino, Jr.*, for defendant.